In re ROBERDS, INC., Debtor.

Roberds, Inc., Plaintiff,

v.

Broyhill Furniture, Defendant.

Bankruptcy No. 00–30194.
Adversary No. 01–3408.

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

Oct. 7, 2004.

Nick V. Cavalieri, Bailey Cavalieri, Columbus, OH, Robert B. Berner, Dayton, OH, for the Debtor.

Walter Reynolds, Dayton, OH, Jerome J. Metz, Jr., Cincinnati, OH, for Broyhill Furniture.

Robert G. Hanseman, Sebaly, Shillito & Dyer, Dayton, OH, for the Unsecured Creditors Committee.

## DECISION ON ORDER GRANTING IN PART AND DENYING IN PART, COUNTS I, III AND IV OF THE COMPLAINT OF ROBERDS, INC.

THOMAS F. WALDRON, Chief Judge.

### Background

On December 26, 2001, Roberds, Inc., the Debtor and Debtor in Possession

(Debtor), filed a complaint against Broyhill Furniture (Creditor) to recover thirty-two allegedly preferential transfers totaling $2,797,806.71. (Doc. 1) Count I sought to avoid these transfers pursuant to 11 U.S.C. § 547(b); Count II sought to avoid these transfers pursuant to Ohio law ("11 U.S.C. § 544(b) and O.R.C. § 1313.56 *et seq.*"); Count III sought recovery of the transfers pursuant to 11 U.S.C. § 550; and Count IV sought to disallow, pursuant to 11 U.S.C. § 502(d), any claim of the Creditor until all preferential transfers were recovered. On May 6, 2002, the Creditor filed an answer generally denying the transfers were preferential and asserting affirmative defenses. (Doc. 7) After an Initial Status Conference, extensive discovery and a series of subsequent pretrial conferences, the trial in this adversary proceeding was scheduled for August 30, 2004. (Doc. 31) On July 23, 2004, the Creditor filed a Motion For Partial Summary Judgment (Doc. 55), which sought to dismiss Count II of the Debtor's Complaint—seeking recovery "under 11 U.S.C. § 544(b), Ohio Revised Code §§ 1313.56 and 1313.57 and other applicable law." The Motion was granted resulting in a dismissal of the state law claim. *Roberds, Inc. v. Broyhill Furniture (In re Roberds, Inc.)*, 313 B.R. 732 (Bankr.S.D.Ohio 2004).[1]

Pursuant to the court's final pretrial order, the parties filed stipulations (Doc. 141), initial trial memoranda (Docs. 151 and 152), final trial memoranda (Docs. 165 and 166), witness lists (Docs. 67 and 68) and proposed exhibits. (Docs. 68, 70–140, 157 and 158) The parties also filed objections to certain proposed exhibits. (Docs. 150 and 153) The court commends all counsel for their preparation and presentation, both before and during the trial, in connection with the documents and testimony covering thousands of transactions be-

tween the parties. The trial occurred from August 30 to September 2, 2004. By agreement of the parties, in lieu of testimony, the court also considered the following excerpts of depositions admitted into evidence, without objection: Clara B. Jones (Debtor Excerpt 1 and Creditor Excerpt 2); James H. McCall (Debtor Excerpt 2 and Creditor Excerpt 3); Dennis R. Burgette (Debtor Excerpt 3) and Melvin Baskin (Debtor Excerpt 4 and Creditor Excerpt 1). At the request of the court, the parties filed, on September 10, 2004, post-trial memoranda on the limited issue of the applicability of the ordinary course of business defense for the check transfer payments during December 1999. (Docs. 213 and 214) In order to determine the issues in this adversary proceeding and provide guidance for a number of the remaining adversary proceedings in this case, the court will publish this written decision.

### *Motion in Limine—The Debtor's Expert Witness*

■ On August 16, 2004, the Creditor filed *Defendant Broyhill, Inc.'s Motion in Limine to Exclude Expert Testimony of Bob Scheufler Proposed by Plaintiff Roberds, Inc.* (Doc. 154). On August 25, 2004, the Debtor filed *Plaintiff's Memorandum in Opposition to Defendant's Motion in Limine* (Doc. 163). The motion (Doc. 154) sought to exclude the testimony of the Debtor's expert, Bob Scheufler. The Creditor asserted Mr. Scheufler lacked sufficient expertise in the payment and credit practices particular to the furniture industry and such knowledge of the furniture industry was required in order to testify as an expert under Federal Rule of Evidence 702 concerning the objective prong of the ordinary course of business

---

**1.** A notice of appeal of that decision was filed by the Debtor. (Doc. 215)

defense [11 U.S.C. § 547(c)(2)(C)]. The court rejects the Creditor's position that demonstrated experience and expertise in the payment and credit practices particular to the furniture industry is necessary to qualify as an expert able to provide testimony concerning the objective prong of the ordinary course of business affirmative defense in this adversary proceeding. This position is an impermissibly restrictive view of Federal Rule of Evidence 702 in connection with the specialized knowledge of credit and payment terms, which are frequently, and were particularly in this adversary proceeding, a significant component of the required analysis of the ordinary course of business affirmative defense.

Federal Rule of Evidence 702, amended as of December 1, 2000, states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The amendment of Federal Rule of Evidence 702 was in response, in particular, to two United States Supreme Court decisions. [See *Schnittjer v. Alliant Energy Co. (In re Shalom Hospitality, Inc.)*, 293 B.R. 211, 214 (Bankr.N.D.Iowa 2003).] The United States Supreme Court In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), held that when expert testimony is proffered, Rule 702 requires the trial court to establish whether the evidence has "a reliable foundation and is relevant to the task at hand." *Id.* at 597, 113 S.Ct. at 2799. As a gatekeeper, pursuant to Federal Rule of Evidence 104(a), the trial court must determine "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. at 2796. In a subsequent decision, *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999), the United States Supreme Court held that the *Daubert* decision is not limited to scientific expert testimony, but instead applies to all expert witness testimony. As noted, the expert testimony must be relevant to the legal issues to be decided, meet the required standards and be, at least potentially, helpful to the trier of fact. See *Beck v. Haik*, 377 F.3d 624, 636–37 (6th Cir.2004). See also Federal Rule of Evidence 401.

The court offered the Creditor the opportunity to defer the court's ruling until the Creditor had the opportunity to *voir dire* the witness immediately before his testimony, or, alternatively, rule on the Creditor's motion before the trial began. The Creditor waived *voir dire* and requested a ruling. The court, based on the reports of Mr. Scheufler (Docs. 54 and 66 [Debtor Exhibit 147]) and the parties' filings (Docs. 154 and 163) overruled the motion.

The court noted that Mr. Scheufler is an employee of D & B [formerly Dun and Bradstreet] with vast experience in commercial credit practices. Mr. Scheufler "... is a Certified Credit Executive as awarded by the National Association of Credit Managers. He has over twelve years of experience with D & B as a business analyst as well as a credit policy consultant. He has investigated over 20,-000 (approximately) businesses for credit worthiness and conducted over 1,500 credit

policy and procedure consultations with D & B customers." (See Debtor Exhibit 147—Supplemental Expert Report, p. 6) Additionally, Mr. Scheufler, although he predominantly based his opinions on "best credit practices" generally, which he opined did not have a large variance industry to industry, did consider the furniture industry, specifically, as a component in arriving at his conclusions. See generally *Speco Corp. v. Canton Drop Forge, Inc. (In re Speco Corp.)*, 218 B.R. 390, 402 (Bankr.S.D.Ohio 1998) (A payment is ordinary under § 547(c)(2)(C) based on the standards in the relevant industry.) Mr. Scheufler's educational and professional experience met the required standard under Rule 702. Cf. *In re Husting Land & Dev't, Inc.*, 255 B.R. 772, 780–81 (Bankr. D.Utah 2000), *aff'd*, 274 B.R. 906 (D.Utah 2002). The court concluded, and reaffirms in this decision, that Mr. Scheufler's testimony was based upon sufficient facts or data, employed reliable principles and methods and reliably applied such principles and methods to the facts in this adversary proceeding. The issues raised by the Creditor's motion (Doc. 154) were more appropriately directed to the weight to be given Mr. Schuefler's testimony, not its admissibility, and failed to establish a basis under Rule 702 to exclude the testimony.

## ISSUES FOR DETERMINATION

### I. THE WIRE TRANSFER ISSUE

Did the Debtor meet the burden required under 11 U.S.C. § 547(b)(2) to establish the January 11, 2000 wire transfer was "for or on account of an antecedent debt owed by the debtor before such transfer was made?"

### II. THE ORDINARY COURSE OF BUSINESS ISSUES

Are the Debtor's transfers by check during the preference period subject to the Creditor's affirmative defense of ordinary course of business [11 U.S.C. § 547(c)(2)]?

1. Consideration of ordinary course of business and Sixth Circuit cases.

2. The pre-preference period and the parties' ordinary course of business.

3. The preference period prior to December 1999 and the parties' ordinary course of business.

 A. The Subjective Prong—11 U.S.C. § 547(c)(2)(B)

 B. The Objective Prong—11 U.S.C. § 547(c)(2)(C)

4. The preference period during December 1999 and the parties' ordinary course of business.

 A. The Subjective Prong—11 U.S.C. § 547(c)(2)(B)

 B. The Objective Prong—11 U.S.C. § 547(c)(2)(C)

### III. THE SUBSEQUENT NEW VALUE ISSUE

Under 11 U.S.C. § 547(c)(4), can the Creditor assert, as a defense to a preference payment, subsequent new value when: (1) the subsequent new value was given to the Debtor (prior to the filing of the bankruptcy and subsequent to a preference payment); (2) the subsequent new value given to the Debtor was repaid by the Debtor to the Creditor; and (3) the Debtor's repayment of the subsequent new value can ultimately be avoided (is not ultimately found to be "otherwise unavoidable") by the Debtor?

### IV. THE COMPULSORY COUNTERCLAIM ISSUE

Is the Creditor's assertion of an administrative claim a compulsory counterclaim to the Debtor's complaint?

## V. 11 U.S.C. § 502(d) ISSUES

May the Creditor obtain an allowed administrative claim prior to satisfaction of any preference recovery judgment against the Creditor?

### *Stipulations*

The parties entered into general stipulations prior to the commencement of the trial. In *Stipulations By Roberds, Inc. and Broyhill Furniture* (Doc. 141), the parties agreed that:

- The Court has jurisdiction over the Adversary.
- The Adversary is a core proceeding.
- Venue of the Adversary is proper.
- The Court has jurisdiction over the Creditor.
- On January 19, 2000 (the "Petition Date"), the Debtor commenced its bankruptcy case (the "Bankruptcy Case") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1330 (the "Bankruptcy Code") by filing a voluntary petition for relief.
- The Debtor is a debtor and debtor in possession.
- The Debtor is a corporation organized under the laws of the State of Ohio.
- As of the Petition Date, the Debtor maintained its principal place of business at 1100 Central Avenue, West Carrollton, Ohio and was engaged in the retail sale of furniture, electronics, appliances and bedding.
- At all times relevant, the Creditor has been a furniture manufacturer, located in Lenoir, North Carolina and was a supplier of goods to the Debtor.
- The Debtor paid money by check or wire transfer to the Creditor in the amount of $2,797,806.71 as set forth in the schedule of payments identified as Debtor Exhibit 4, and copies of the checks and wire transfer set forth in Debtor Exhibit 4 are identified as Debtor Exhibits 5 through 36 (individually a "Payment" and collectively, the "Payments").
- The Creditor received the Payments.
- The Debtor had an interest in each of the Payments.
- Each of the Payments was a "transfer" within the meaning of Bankruptcy Code § 101(54).
- Each of the Payments was made to the Creditor while the Debtor was insolvent within the meaning of Bankruptcy Code § 101(32).
- With the exception of the final Payment of $65,716.40, the Payments were made by check (the "Check Payments").
- The Check Payments were made to or for the benefit of the Creditor as a creditor of the Debtor. The Creditor was a creditor of the Debtor with respect to each of the Check Payments.
- Each of the Check Payments was made for or on account of and paid antecedent debt owed by the Debtor to the Creditor before the Check Payments were made. These debts were incurred by the Debtor purchasing furniture and other merchandise from the Creditor. Each such debt was owed by the Debtor to the Creditor.
- Buying furniture and other merchandise for resale was a regular, routine part of the Debtor's business and selling furniture and other merchandise to resellers was a regular, routine part of the Creditor's business.
- The Check Payments enabled the Creditor to receive more than the Creditor would receive if (a) the Bankruptcy Case were a case under chapter 7 of the Bankruptcy Code; (b) the Check Payments had not been made; and (c) the Creditor received payment

to the extent provided by the Bankruptcy Code.

- The Creditor was the initial transferee of the Payments or the entity for whose benefit the Payments were made, within the meaning of Bankruptcy Code § 550.
- At all times when the Debtor made the Payments to the Creditor, the Debtor was an operating company engaged in the retail sale of furniture and other products.
- At the Debtor's request, the Creditor shipped merchandise (furniture and other products) to or for the benefit of the Debtor after the first Payment and before the Petition Date ("Shipments").
- On August 20, 2000, the Debtor made a written demand to the Creditor to return the Payments, a copy of which is identified as Debtor Exhibit 1, which written demand was received by the Creditor not later than September 1, 2000.

## I. THE WIRE TRANSFER ISSUE

**Did the Debtor meet the burden required under 11 U.S.C. § 547(b)(2) to establish the January 11, 2000 wire transfer was "for or on account of an antecedent debt owed by the debtor before such transfer was made?"**

### Wire Transfer Stipulations

With respect to the January 11, 2000 wire transfer, the parties entered into additional stipulations. See *Stipulations By Roberds, Inc. And Broyhill Furniture* (Doc. 141):

- The final Payment of $65,716.40 was made by wire transfer (the "Wire Transfer").
- The Wire Transfer was made to or for the benefit of the Creditor.

- It is *disputed* whether the Creditor was a creditor with respect to the Wire Transfer and it is disputed whether the Wire Transfer was made for or on account of an antecedent debt owed by the Debtor before such transfer was made. *However, it is stipulated* that if the Debtor establishes both a) that the Creditor was a creditor of the Debtor with respect to the Wire Transfer and b) that the Wire Transfer was made for or on account of an antecedent debt owed by the Debtor before such transfer was made, then the Wire Transfer also would have enabled the Creditor to receive more than the Creditor would receive if (a) the Bankruptcy Case were a case under chapter 7 of the Bankruptcy Code; (b) the Wire Transfer had not been made; and (c) the Creditor received payment to the extent provided by the Bankruptcy Code. (emphasis added)

In order to establish a transfer was preferential, the Debtor, pursuant to 11 U.S.C. § 547(g), has the burden to establish the five elements of 11 U.S.C. § 547(b):

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

 (A) on or within 90 days before the date of the filing of the petition; or

 (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the

time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The parties stipulated that this wire transfer alleged to be preferential by the Debtor met all of the elements of § 547(b), with one exception [2]—whether the transfer was "for or on account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(2).

◼ The Debtor argued that the initial check paid the Debtor's oldest outstanding accounts payable first and the wire transfer should be applied to the Debtor's then existing debts to the Creditor, even if subsequent goods were delivered. See *Van Huffel Tube Corp. v. A & G Indus. (In re Van Huffel Tube Corp.)*, 74 B.R. 579, 586 (Bankr.N.D.Ohio 1987) ("The testimony . . . shows that [the debtor] paid a percentage of the amounts owed to its trade creditors, that all creditors receiving payments had outstanding invoices which were approximately 150 days old, and that it was the practice of [the debtor] to pay its oldest accounts first.") The Creditor argued that the wire transfer was for furniture not yet delivered and, therefore, the wire transfer was not on account of an antecedent debt within the meaning of 11 U.S.C. § 547(b). See *Ledford v. Fort Hamilton Hughes Mem'l Hosp. Ctr. (In re*

*Mobley)*, 15 B.R. 573, 575 (Bankr.S.D.Ohio 1981) (Pre-payment for hospital services is not for or on account of an antecedent debt.)

The Court recognizes that this fact pattern—issuing a check for goods previously invoiced, voiding that check, and subsequently paying the same amount by wire transfer for future goods—may appear to be a disingenuous device to avoid applicable preference law; however, in the specific facts of this adversary proceeding, the court determines the Debtor failed to meet the burden required under 11 U.S.C. § 547(b)(2) to establish the January 11, 2000 wire transfer was "for or on account of an antecedent debt owed by the debtor before such transfer was made." The undisputed evidence established that, prior to the wire transfer, the Debtor had issued a check to the Creditor in the amount of $65,716.40. This exact amount, $65,716.40, was subsequently provided to the Creditor in the wire transfer. (Debtor Exhibits 82 and 83) The initial check, numbered 120688, dated December 31, 1999, was not accepted as payment for outstanding prior invoices and, based on the parties' agreement, was voided by the Creditor. (Debtor Exhibit 84) The undisputed evidence further established that the prior invoices, which the Debtor had proposed to pay with the initial check, remain unpaid and are part of the Creditor's unpaid prepetition claim. A January 6, 2000 letter from the Creditor to the Debtor established that the parties had, by that date, ended their credit relationship. (Joint Exhibit 10) The Debtor then agreed to wire transfer the same amount as the initial check [$65,-716.40] to pay for future shipments by the Creditor. The Creditor, thereafter, sent $65,625.00 worth of furniture to the Debt-

---

**2.** The court need not analyze the Creditor's alternative argument that, for the wire transfer, it was not a "creditor." See 11 U.S.C.

§ 101(10) (defining the term "creditor" as used in the Bankruptcy Code).

or, leaving the Creditor with a $91.40 credit. (See Creditor Exhibit N) No portion of the wire transfer was applied to the payment of a prior invoice.

Whatever the general business practices of the Debtor and the Creditor may have been prior to this date, the uncontroverted evidence established the wire transfer was not "for or on account of an antecedent debt." Rather, the wire transfer was payment for future goods and the Creditor, after receipt of the wire transfer, shipped these goods to the Debtor.

The Debtor failed to failed to meet its burden required under 11 U.S.C. § 547(b)(2) to establish the January 11, 2000 wire transfer was "for or on account of an antecedent debt owed by the debtor before such transfer was made." Accordingly, the court need not determine whether the wire transfer was subject to any of the Creditor's affirmative defenses.

## II. THE ORDINARY COURSE ISSUES

Are the Debtor's transfers by check during the preference period subject to the Creditor's affirmative defense of ordinary course of business [11 U.S.C. § 547(c)(2) ]?

1. **Consideration of ordinary course of business and Sixth Circuit Cases.**
2. **The pre-preference period and the parties' ordinary course of business.**
3. **The preference period prior to December 1999 and the parties' ordinary course of business.**
 A. The Subjective Prong –11 U.S.C. § 547(c)(2)(B)
 B. The Objective Prong—11 U.S.C. § 547(c)(2)(C)

4. **The preference period during December 1999 and the parties' ordinary course of business.**
 A. The Subjective Prong—11 U.S.C. § 547(c)(2)(B)
 B. The Objective Prong—11 U.S.C. § 547(c)(2)(C)

As will become apparent throughout this decision, this adversary proceeding does not contain a fact pattern of late payments, which are often the focus of reported preference decisions; but, rather, a fact pattern of accelerated payments, which, depending on the time period involved, are in the parties' ordinary course of business or are not in the parties' ordinary course of business. This section, which generally discusses whether the Debtor's transfers by check, which the parties agreed were during the preference period, are subject to the Creditor's affirmative defense of ordinary course of business [11 U.S.C. § 547(c)(2) ], does so by analyzing three separate time periods.

The first period is the pre-preference period which, for these parties, constitutes 30 years of successful business. The second period is the preference period prior to December 1999, during which the parties experienced events which had not previously occurred in their relationship; but, which were, nevertheless, in the ordinary course of their business. The third period is the preference period during December 1999 [3], in which the parties experienced events which had not previously occurred in their relationship and were not in the ordinary course of their business.

1. **Consideration of ordinary course of business and Sixth Circuit cases.**

Statutory affirmative defenses to preference recovery were unknown under the

---

**3.** Although the Debtor filed bankruptcy on January 19, 2000, the last check transfer issued by the Debtor to the Creditor in the preference period was dated December 29, 1999. (Debtor Exhibit 35)

Bankruptcy Act. The historical purpose of enacting these defenses is discussed in a leading bankruptcy treatise:

One apparent legislative purpose in defining explicit exceptions to basic preference law was to identify and provide guidance for the analysis of issues that, in the past, have materially contributed to the complexity of preference law. Historically, courts have been presented with cases that, although technically within the definition of a preference, do not justify application of the relatively harsh sanctions applicable in the preference context. One response has been to bend the basic definitional constructs of a preference. Under the Code, this type of analysis would appear to be both unnecessary and inappropriate. If protected, these transfers should be protected under one or more of the explicit exceptions.

Norton Bankruptcy Law and Practice 2d, § 57.12, Page 57–61 (June 2004). Once a preference is proven, it still may not be avoided if the transferee (the Creditor) can establish the defense of ordinary course. 11 U.S.C. § 547(c)(2) states that:

A trustee may not avoid under this section a transfer—

to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms[.]

The Bankruptcy Code further provides that the party asserting any of the exceptions in 11 U.S.C. § 547(c) has the burden of proving the exception by a preponderance of the evidence. 11 U.S.C. § 547(g).

The Bankruptcy Code does not define either "ordinary course of business" or "ordinary business terms" and the legislative history is sparse; however, the meanings accorded these terms have developed in case law. See *Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239, 243 (6th Cir.1992). As noted in *Fred Hawes:*

The legislative history on § 547(c)(2) is minimal. The sole relevant provision states that "[t]he purpose of this exception is to leave undisturbed normal financing relations, because it does not detract from the general policy preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S.Rep. No. 989, 95th Cong., 2d Sess. 88, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5874.

*Id.* The Sixth Circuit has stated that "subsequent case law is in agreement that this section was intended to 'protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the Debtor and the transferee.'" *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 872 F.2d 739, 743 (6th Cir.1989) (citation omitted).

The Creditor's affirmative defense of ordinary course of business has a three part, conjunctive test; however, as is frequently true, the dispute in this adversary proceeding focuses on the (B) (subjective) and (C) (objective) subsection prongs. The Debtor did not contest in its filings that the transfers were in the payment of a debt incurred in the "ordinary course of business" between the Debtor and the Creditor within the meaning of 11 U.S.C. § 547(c)(2)(A). Judge William A. Clark of this court noted that the modern case law recognizing the objective and subjective component in § 547(c)(2)(B) and (C) has, ironically, eliminated almost any indepen-

dent meaning to § 547(c)(2)(A). *Speco Corp.*, 218 B.R. at 397–98; See also *Fred Hawes*, 957 F.2d at 243. Based on the parties' stipulations and the evidence presented at trial, the court determines the check transfers were in the payment of a debt incurred in the "ordinary course of business" between the Debtor and the Creditor within the meaning of 11 U.S.C. § 547(c)(2)(A).

Concerning the (B) (subjective) and (C) (objective) subsection prongs of the ordinary course of business affirmative defense, the Sixth Circuit has stated:

> Subsections (B) and (C) of section 547(c)(2) "comprise a subjective and objective component respectively." *Logan v. Basic Distribution Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239, 244 (6th Cir.1992). "The subjective prong (subsection (B)) requires proof that the debt and its payment are ordinary in relation to other business dealings between that creditor and that debtor. The objective prong (subsection (C)) requires proof that the payment is ordinary in relation to the standards prevailing in the relevant industry." *Id.* Pursuant to section 547(g), the creditor bears the burden of proving the nonavoidability of a transfer under section 547(c)(2) by a preponderance of the evidence. *Id.* at 242.

*Luper v. Columbia Gas of Ohio, Inc. (In re Carled, Inc.)*, 91 F.3d 811, 813 (6th Cir.1996). In determining what is "ordinary," the Sixth Circuit has explained that:

> Whether a payment is made in the ordinary course of business and according to ordinary business terms is a factual determination .... *In re Fulghum Const. Corp.*, 872 F.2d 739, 742 (6th Cir.1989). The *Fulghum* court determined that section 547(c)(2) was intended to "protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the debt-

or and the transferee." *Id.* at 743 (citation omitted). Because there is no readily applicable test of what constitutes an "ordinary course of business," this court must engage in a factual analysis of "the business practices which were unique to the particular parties under consideration ..." *Id.*

In considering which transactions are ordinary, courts examine several factors, including timing, the amount and manner a transaction was paid and the circumstances under which the transfer was made. *In re White*, 58 B.R. 266 (Bankr.E.D.Tenn.1986). Thus, "[e]ven if the debtor's business transactions were irregular, they may be considered 'ordinary' for purposes of 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties." *Fulghum*, 872 F.2d at 743 (citing *In re White*, 58 B.R. at 270). The *Fulghum* court did acknowledge that courts "might" be required to examine the industry standards in addition to the parties' prior dealings. *Id.* at 743, n. 2. Although there was no need to examine industry practices in *Fulghum*, in the instant case, industry practices are directly implicated.

*Yurika Foods Corp. v. United Parcel Serv. (In re Yurika Foods Corp.)*, 888 F.2d 42, 45 (6th Cir.1989).

In regard to specifically addressing the objective prong of the ordinary course of business defense, "made according to ordinary business terms," the Sixth Circuit, after reviewing and collecting other circuit opinions, stated:

> Following the clear consensus among the courts of appeals that have interpreted section 547(c)(2)(C), we hold that "ordinary business terms" means that the transaction was not so unusual as to render it an aberration in the relevant industry. Therefore, we reject the defi-

nition of "ordinary business terms" adopted by the district court, which would require that the transactions at issue resemble a majority of the industry's transactions, and we also reject the definition adopted by the bankruptcy court requiring Columbia to establish the lateness as a pattern for a *significant* percentage of specific customers. (emphasis in original; footnote omitted)

*Carled,* 91 F.3d at 818; See also *In re Tolona Pizza Prods. Corp.,* 3 F.3d 1029 (7th Cir.1993) and *Ganis Credit Corp. v. Anderson (In re Jan Weilert RV, Inc.),* 315 F.3d 1192 (9th Cir.2003) Section 547(c)(2)(C) is often, as in this adversary proceeding, the subject of expert testimony. See, e.g., *Seaver v. Allstate Sales & Leasing Corp. (In re Sibilrud),* 308 B.R. 388, 397 (Bankr.D.Minn.2004) (citation omitted).

With respect to the subjective prong, § 547(c)(2)(B), the Sixth Circuit has explained that:

> With respect to subsection (B), the subjective component, the courts generally eschew precise legal tests and instead engage in a fact-specific analysis. *Fulghum,* 872 F.2d at 743. In doing so, they examine several factors, "including timing, the amount and manner a transaction was paid and the circumstances under which the transfer was made." *Yurika,* 888 F.2d at 45. Late payment of a debt has been considered particularly important in determining whether the payment is ordinary. *Marathon Oil Co. v. Flatau (In re Craig Oil Co.),* 785 F.2d 1563, 1567 (11th Cir.1986). A late payment will be considered "ordinary" only upon a showing that late payments

were the normal course of business between the parties. *Yurika,* 888 F.2d at 44; *Fulghum,* 872 at 743; *Lovett v. St. Johnsbury Trucking,* 931 F.2d 494, 498 (8th Cir.1991); *In re Xonics Imaging, Inc.,* 837 F.2d 763, 767 (7th Cir.1988); *Storey v. Dayton Power and Light Co. (In re Cook United, Inc.),* 117 B.R. 884, 887–88 (Bankr.S.D.Ohio 1990).

*Fred Hawes,* 957 F.2d at 244.

■ At this point it is appropriate to consider whether communications and activities can be "ordinary" in the course of the parties' financial relations, if such communications and activities had never previously occurred in the parties' history. The Debtor has repeatedly argued that many of the parties' communications and activities during the preference period had never occurred in the parties' prior history and, as a result, could not be found to be "ordinary" in the parties' financial relations. An intuitive, and even a dictionary [4] response might appear to support the argument that, if an event has never occurred in the parties' previous dealings, it could not be "occurring or encountered in the usual course of events: not uncommon or exceptional: not remarkable: ROUTINE, NORMAL [.]" Webster's Third New International Dictionary 1589 (1981) (emphasis in original). The Sixth Circuit, however, has determined that an activity, in the preference period, can be ordinary in the course of the parties' business, even if it never previously occurred in the parties' history.

The Sixth Circuit first announced this position in *Gosch v. Burns (In re Finn),* 909 F.2d 903, 908 (6th Cir.1990), in which the circuit reversed the district court,

---

**4.** Webster's Third New International Dictionary 1589 (1981) defines ordinary as "occurring or encountered in the usual course of events: not uncommon or exceptional: not remarkable: ROUTINE, NORMAL [.]" See

*Eldred v. Ashcroft,* 537 U.S. 186, 199, 123 S.Ct. 769, 778, 154 L.Ed.2d 683 (2003) (One of many cases from the United States Supreme Court citing Webster's Third New International Dictionary.)

which had affirmed the bankruptcy court's decision, and stated:

> We hold that, as a general rule, subject to the individual fact-finding powers of the district court in a specific inquiry, a transaction can be in the ordinary course of financial affairs even if it is the first such transaction undertaken by the customer. This rule holds where the transaction would not be out of the ordinary for a person in the borrower's position.

Accord *Kleven v. Household Bank F.S.B.*, 334 F.3d 638 (7th Cir.2003); *Golfview Dev. Ctr., Inc. v. All–Tech Decorating Co. (In re Golfview Dev. Ctr., Inc.)*, 309 B.R. 758 (Bankr.N.D.Ill.2004); *USOP Liquidating LLC v. Serv. Supply, Ltd., Inc. (In re U.S. Office Prods. Co.)*, 315 B.R. 37 (Bankr. D.Del.2004); But see *Brizendine v. Barrett Oil Distribs., Inc. (In re Brown Transp. Truckload, Inc.)*, 152 B.R. 690 (Bankr.N.D.Ga.1992) (first time transaction categorically ineligible for protection as a payment in the ordinary course of business)

Since every business relationship must begin with an initial transaction between the parties, and § 547(c)(2) contains no exclusion for first time transactions, it would unnecessarily restrict the meaning and intent of the statute to exclude a first time transaction from the benefit of the defense, even though, obviously, the transaction could not have previously occurred.

Although this is the result in first time transactions, the following section examines whether communications and activities, which have never previously occurred between parties who have a substantially longer relationship may, nevertheless, still be "ordinary."

The Sixth Circuit's decision in *Brown v. Shell Canada Ltd. (In re Tennessee Chem. Co.)*, 112 F.3d 234 (6th Cir.1997) provided more specific guidelines concerning ordinary course in connection with a long term debtor/creditor business relationship, in which the creditor was being paid by a debtor, who was a "slow payer." The Sixth Circuit reminded bankruptcy courts to consider several factors including the history of the parties' dealings with each other, timing, the amount at issue, the circumstances of the transaction and, generally, the entire course of dealings between the parties. Nothing in either the bankruptcy court's or the Sixth Circuit's decisions in *Tennessee Chemical* indicates that the factors the Sixth Circuit considered had ever occurred in the parties' history. These factors included: late payments in which, when the debtor failed to make payments on due dates, the creditor "raised an alarm almost immediately," this alarm then "turned to pressure" based on rumors that the debtor was "about to fail" and was followed by a "series of threatening letters" in which the creditor was "not treating sixteen days as a normal or acceptable delay in payment." *In re Tennessee Chem. Co.*, 159 B.R. 501, 512 (Bankr.E.D.Tenn.1993) The Bankruptcy Court determined that two payments, sixteen and seventeen days late, were not in the ordinary course. *Id.* The Sixth Circuit, reversing in part and affirming in part, noted:

> Under the bankruptcy court and district court rulings, [the creditor] is punished for not terminating its relationship with [the debtor] sooner. Under such an approach, a supplier needs to have rigid bright-line rules to protect itself; otherwise it puts itself at risk. However, the "ordinary course of business" exception is intended to cover precisely the type of situation now before us, allowing suppliers and other furnishers of credit to receive payment within the course that has developed in the commercial relationship between the parties unless sub-

stantial deviations from established practices occur.

*In re Tennessee Chem. Co.*, 112 F.3d at 238.

■ This court suggests that Sixth Circuit cases eschew a one event/one result approach to ordinary course and require a recognition that, although it remains the Creditor's burden to establish the defense [11 U.S.C. § 547(g)], an appropriate ordinary course analysis requires a recognition that a variety of events in the course of the parties' business history may be found ordinary, even though these events never occurred in the parties' history. This court recognizes that merely suggesting a template of guidelines could be viewed as establishing a trough of granite into which counsel may attempt to compress their "facts" to produce an assured conclusion. The court notes that these suggested guidelines are not intended to provide an assured answer to the variety of factual circumstances inherent in an ordinary course defense, but, merely to provide an additional framework for an analysis of such a defense. The rigid applications of these suggested guidelines would be inherently inconsistent with the Sixth Circuit's admonition that a bankruptcy court "must engage in a factual analysis of the 'business practices which were unique to the particular parties under consideration ....' " *Yurika Foods Corp.*, 888 F.2d at 45 (citation omitted). These suggested guidelines may be conceptually considered the difference between a creditor asking and a creditor acting; in essence, a legal application of the adage—"it can't hurt to ask."

This Court believes that the following guidelines constitute corollaries which are consistent with the Sixth Circuit's conclusions in *Tennessee Chemical*:

| POTENTIALLY ORDINARY CREDITOR ACTIVITY | POTENTIALLY *NOT* ORDINARY CREDITOR ACTIVITY |
|---|---|
| **creditor question** <br> When will payment due according to existing terms be received?—even if this question concerning payment had never been previously asked. | If payment for an antecedent debt is not received according to its terms and any one, some or all of the following activities are present, the payment may not be in the ordinary course of the parties' business: |
| **creditor communication** <br> There is increased concern about receipt of payment due according to existing terms—even if such a concern had never been previously expressed. | 1. creditor change from prior or existing credit *terms.* <br><br> 2. creditor change from prior or existing credit *limits.* |
| **creditor frequency** <br> There are repeated requests for payment or expressions of concern about payment due according to existing terms—even if there had never been such repeated requests. | 3. creditor change from prior or existing *sales* of goods and services. <br><br> 4. creditor change from prior or existing *shipment* of goods and services. <br><br> 5. creditor change from the existing required *amounts* of payments to be made. |
| **identity of creditor contact** <br> There is contact by senior management or a creditor representative with increased authority involving credit decisions concerning payment due according to existing terms—even if there was never contact | 6. creditor change from the existing required *timing* of payments to be made. <br><br> 7. creditor changes in *future* credit terms, limits, sales, shipments, the amount of |

by such senior management or a creditor representative.

payments required or the timing of payments.

This court will use the above guidelines as a component of the analysis employed in determining whether the transfers at issue occurred in the parties' ordinary course of business. This court recognizes that the presence of collection activities, which were never part of the parties' prior history, are an appropriate component of an ordinary course analysis; however, the more determinative component is an analysis of whether such activities actually impacted the parties' credit and payment practices. See, e.g., *Central Hardware Co., Inc. v. The Walker–Williams Lumber Co. (In re Spirit Holding Co., Inc.),* 214 B.R. 891, 898 (E.D.Mo. 1997) ("Payments made in response to unusual debt collection practices by the creditor are outside the scope of the ordinary course of business defense." (citations omitted))

## 2. The pre-preference period and The parties' ordinary course of business.

The parties stipulated that the following transfers, all by check, occurred during the preference period and satisfied the Debtor's burden to establish the elements of 11 U.S.C. § 547(b):

| Check Number | Check Date | Check Amount |
| --- | --- | --- |
| 114690 | 10–15–1999 | $ 97,889.67 |
| 114895 | 10–18–1999 | $ 48,884.72 |
| 115112 | 10–20–1999 | $ 50,782.50 |
| 115243 | 10–22–1999 | $164,764.62 |
| 115425 | 10–25–1999 | $ 80,192.00 |
| 115582 | 10–27–1999 | $ 18,690.31 |
| 115869 | 10–29–1999 | $ 57,544.09 |
| 116028 | 10–31–1999 | $ 93,165.42 |
| 116212 | 10–31–1999 | $ 98,114.50 |
| 116356 | 11–05–1999 | $ 9,611.12 |
| 116497 | 11–08–1999 | $196,625.75 |
| 116673 | 11–10–1999 | $106,044.29 |
| 116899 | 11–12–1999 | $ 50,652.67 |
| 117111 | 11–15–1999 | $ 36,429.44 |
| 117303 | 11–17–1999 | $113,387.88 |
| 117523 | 11–19–1999 | $100,441.06 |
| 117724 | 11–22–1999 | $120,055.00 |
| 117948 | 11–24–1999 | $ 93,061.95 |
| 118138 | 11–29–1999 | $314,269.00 |
| 118382 | 11–30–1999 | $103,089.60 |
| 118646 | 11–30–1999 | $ 45,693.98 |
| 118797 | 12–06–1999 | $ 42,406.12 |
| 118966 | 12–08–1999 | $110,242.80 |
| 119194 | 12–10–1999 | $ 2,594.34 |
| 119337 | 12–13–1999 | $186,046.38 |
| 119482 | 12–15–1999 | $ 35,380.51 |
| 119557 | 12–17–1999 | $104,439.05 |
| 119751 | 12–20–1999 | $ 98,601.97 |
| 119934 | 12–23–1999 | $ 10,743.12 |
| 120202 | 12–27–1999 | $ 71,360.05 |
| 120410 | 12–29–1999 | $ 70,886.34 |

Accordingly, these transfers are avoidable by the Debtor, unless the Creditor can establish one of the defenses under 11 U.S.C. § 547(c). The initial determination is whether these transfers are subject to the defense of ordinary course under § 547(c)(2). An appropriate analysis of ordinary course must focus on the parties' transfers; however, other aspects of the parties' financial affairs provide a required backdrop. In order to understand the ordinary course of the parties' relationship during the preference period, it is helpful to first understand the parties' relationship prior to the preference period.

The testimony established that for many years prior to October 1999, the Debtor rigorously emphasized, and actually completed, prompt payment to all its creditors as an integral part of the Debtor's business operations. The evidence established that, prior to the preference period, checks were routinely sent by the Debtor to its

creditors prior to the due date, in some instances a full week prior to the due date.

The specific business relationship of the Debtor and Creditor was a long standing and highly successful one. Over the years, the Debtor came to consider the Creditor the most important vendor of the Debtor and, prior to the preference period, the parties customarily engaged in business transactions of approximately $1,000,000 on a monthly basis. The Creditor, however, had become generally concerned about the Debtor's financial health as early as late 1998. (See Joint Exhibit 3—November 3, 1998 internal Creditor memorandum concerning the Debtor's financial health) The Creditor was aware, in the pre-preference period, of the Debtor's continuing losses for the 1st and 2nd quarter of 1999. (See, e.g., Joint Exhibit 19 [March 29, 1999 article titled "Roberds Auditor cites doubts about future."] and Debtor Exhibit 43, p. 24 [cautionary statement of Deloitte and Touche from the Debtor's 1998 Annual Report]) Mr. Jefferson Norris, Jr., the Manager of the Creditor's Credit Department, testified that the credit limit available to the Debtor had been reduced from $1,000,000 in the beginning of 1999 to $725,000 in April 1999. The Court notes there was an additional $25,000 in credit separately available. (For the balance of this decision, the Court will refer to a single credit limit of $750,000) Mr. Norris also testified that the Creditor's internal computer system, if not manually overridden, automatically allowed the Debtor to exceed the maximum credit limit by 25 percent if the Debtor's payments maintained an average payment timing of less than 34 days. The court finds this credit limit was never enforced by the Creditor during the pre-preference period and the automatic credit system was never overridden in the pre-preference period. (See Creditor Exhibit R)

In the summer of 1999, the Debtor decided to streamline its sales workforce and was in negotiations concerning a new collective bargaining agreement. Reacting adversely to the Debtor's proposed plan, a strike was threatened and the Debtor's sales employees participated in a boycott. (See Joint Exhibit 4—"Roberds Shopping Notice" issued by the union) This boycott severely affected sales and was a contributing factor in the Debtor's downward economic spiral. These events led to the decision, in the fall of 1999, that the Debtor would file bankruptcy after the holiday shopping season. The Creditor became aware of, and monitored, these developments.

The Debtor hired Deloitte & Touche in the third quarter to help develop a plan to turnaround the Debtor's business. The Creditor was slated to play an extremely significant, if not the most significant role, in the Debtor's plan to streamline its furniture vendors. This central role, which the Creditor would play in the Debtor's proposed business plan, made the amount of credit the Creditor would provide to the Debtor of enormous significance. As a result of this plan, the Debtor's dependence on the availability of credit from the Creditor would greatly increase.

Despite the presence of all these factors, the Court determines the Creditor engaged in no unusual collection activities, nor did the Debtor engage in any unusual payment activities, prior to the preference period.

3. **The preference period prior to December 1999 and the parties' ordinary course of business.**

A. **The Subjective Prong—11 U.S.C. § 547(c)(2)(B)**

In the third quarter of 1999, the Debtor no longer continued its practice of early or timely payments and began to pay

certain creditors later than it had previously made such payments. The Creditor was aware of the third quarter results of the Debtor about the time of its public release, October 25, 1999. (See Joint Exhibit 5) Those results showed the Debtor suffered a loss of $3,347,000. Concern about the third quarter results led to increasing contact between the Debtor and Creditor's senior management.

Gearry Davenport, the Debtor's Chief Financial Officer at this time, testified that during the preference period, he would review the accounts payable report (See Joint Exhibit 11) and make specific daily determinations concerning who would be paid. The evidence further established that, although was no written, signed, formal plan to prefer some of the Debtor's creditors to others, creditors were generally paid as follows: electronics creditors were to be paid near current (within three days of sending of merchandise)[5]; furniture creditors were generally to be paid within terms (although certain, usually smaller, furniture vendors were not always accorded this treatment); and other creditors (particularly media, lessors and creditors not applying pressure to the Debtor) were to be paid, according to terms, only if funds were available. However, the evidence showed, as detailed in this section, that the actual timing of such payments during the preference period prior to December 1999 did not significantly change.

Mr. Norris testified credibly about the credit relationship of the Debtor and the Creditor. Throughout the parties' history, the Creditor's terms of payment to the Debtor had always been net 30 days from the invoice date ("Net 30"). On November 9, 1999, Mr. Norris sent an e-mail to Mr. Davenport. The e-mail was blind copied to Jerry Church, the Senior Vice President and Chief Financial Officer of the Creditor. (Joint Exhibit 6) The e-mail noted that checks received on October 31 and November 5, 1999 reflected a 36 day pay average from invoice. The e-mail noted:

> This time last year, the pay average on the account stood at 31 days from date of invoice. What alterations will be made in the payable system to pull the present day average of 36 back in line to the 31 days?

(The 31 days, rather than Net 30, reflected the one day the Creditor required in order to input receipt of the payment into the Creditor's internal computer system.) Mr. Norris did not recall receiving a specific response from the Debtor to this e-mail, nor any immediate change in the timing of payments by the Debtor; however, he did receive an e-mail on November 10, 1999 indicating the Debtor's system was "set-up to cut [the Creditor] 30 days from invoice. . . ." (Joint Exhibit 7)

The evidence further established that when the Debtor received an invoice, the Debtor's credit department put an internal stamp on it. (See, e.g., Creditor Exhibit D) The Debtor's credit department would then hand write on each invoice, among other items, the date of the invoice and date payment was due. Starting on or about November 12, 1999, the date the payment was due was reduced to 25 days from 30 days. (Compare Debtor Exhibits 58 and 151) The evidence established this alteration was the Debtor's attempt to allow for sufficient mailing time so that the Creditor would actually receive the payment on or about 30 days from the invoice date. Without regard to the e-mails, meetings, correspondence or other communications of the Creditor, all of which fall

---

**5.** The policy of paying electronics vendors *almost current dated* as far back as 1994. It was incumbent to continue this policy because in the 1999 holiday shopping season, the Debtor was implementing a strategy to develop a home theatre business.

into the "ask," rather than "act" categories, there were no significant changes in the Debtor's payments, except to attempt to bring such payments back into Net 30 terms, which were the existing terms between the parties. The testimony of the Creditor's former assistant Credit Manager, Christopher Canipe, established that payment timing did not significantly change during this time. Mr. Norris similarly testified, and the court finds, the timing of payments from the Debtor prior to the e-mail and subsequent to the e-mail did not change in any significant manner, during the preference period prior to December 1999. (See Creditor Exhibit R) Specifically, the testimony of Mr. Norris, based on the Creditor's internal records (Creditor Exhibit R), showed the ten checks before the November 9th e-mail and the 10 checks subsequent (all dated before December 1999) both had a mean, median and mode of 34 days from invoice. The testimony of the Debtor's witness, Donald Kennedy, showed that, during the preference period before December 1999, payments were within, on average, less than one day from the Net 30 terms. (See also Debtor Exhibit 153)

The Debtor is correct that the Creditor, during the preference period prior to December 1999, raised questions directly with the Debtor regarding the Debtor's failure to make payment Net 30 and the Creditor never had previously raised such questions. The Debtor is correct that the Creditor, during the preference period prior to December 1999, expressed serious concerns directly to the Debtor about payment and required the Debtor to take steps to assure payment was made Net 30 and the Creditor never had previously expressed such concerns and such a requirement. The Debtor is correct that the Creditor, during the preference period prior to December 1999, repeated these questions, concerns and requirements directly to the Debtor regarding the Debtor's failure to make payment Net 30 and the Creditor never had previously repeated these questions, concerns and requirements. The Debtor is correct that the Creditor, during the preference period prior to December 1999, initiated contacts, through the Creditor's senior management and other Creditor representatives with increased authority involving credit decisions, concerning the Debtor's failure to make payments Net 30 and the Creditor never had previously initiated contact about payment through its senior management and other Creditor representatives with authority involving credit decisions. The Debtor is also correct that during this period there was a reduction, based on the Creditor's internal computer records, of $589,148.52 in the amount the Debtor owed the Creditor. (Creditor Exhibit R—[October 27, 1999—$1,719,702.65 and November 30, 1999—$1,130,554.13])

There are several significant components of the ordinary course analysis which emerge from a consideration of the course of the communications and activities of the Creditor and the Debtor in the preference period prior to December 1999. The court determines the following: First, all these activities of the Creditor are more appropriately characterized as creditor "asking," rather than creditor "acting" activities. Second, all these communications and activities of the Creditor sought to obtain payment according to the parties' payment terms—not accelerated, not extended, but *existing* payment terms—and the actual payments made were consistent with the parties' long term payment history. Third, since an appropriate ordinary course analysis considers not only the Creditor, but also the Debtor, whatever rhetoric was involved, the reality was that the Debtor did not significantly change payment terms and did not suffer any

significant harm in its credit relationship with the Creditor during the preference period prior to December 1999.

The Court determines that, while there was rhetoric concerning a credit hold, the reality was the Creditor did not enforce a credit hold and the Debtor, without any adverse economic consequences, exceeded the $750,000 credit limit during the preference period prior to December 1999. Similarly, although there was rhetoric concerning the necessity of the Creditor receiving payment Net 30 from the Debtor, the reality was the Creditor did not enforce this requirement and the Debtor, without adverse economic consequences, failed to make payments Net 30 during the preference period prior to December 1999.

An issue remains with regard to checks which were written by the Debtor in November, but not received by the Creditor until after December 1, 1999. As this court has noted, consistent with Sixth Circuit law and this court's suggested guidelines, there was no talismanic event separating November 30th and December 1st. Instead, the parties' business relationships proceeded along a continuum from ordinary to not ordinary. The checks from the Debtor dated at the end of November 1999, which were delivered to the Creditor at the beginning of December 1999, are determined to be transfers in the ordinary course of the parties' business. The court finds that both on the date of the issuance of the checks in late November 1999 and at the time of the receipt (and eventual honor) in the first days of December 1999, the parties' transfers were in their ordinary course. This conclusion is not at odds with either the decision of the U.S. Supreme Court in *Barnhill v. Johnson*, 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992) or the Sixth Circuit's decision in *Tennessee Chemical.* *Barnhill* established the date

of honor for check payments applies in determining a transfer for purposes of 11 U.S.C. § 547(b). *Id.* at 402, 112 S.Ct. at 1391. *Tennessee Chemical* established the date of receipt for check payments for purposes of 11 U.S.C. § 547(c)(4) (subsequent new value). The underlying rationale of *Tennessee Chemical,* holding that a transfer (for purposes of § 547(c)(4)) occurs at the time of receipt, encourages creditors to continue their revolving account receivable transactions with financially troubled debtors, since it will provide a creditor with an opportunity for protection in preference circumstances.

In the context of this adversary proceeding and the ordinary course of business defense under § 547(c)(2), whether the date of transfer is determined to be at receipt, or honor, in early December 1999, the payments were in the ordinary course of the parties' business. The appropriate inquiry remains whether the payment, from initiation to honor, was in the ordinary course of the parties' business. See *Barnhill* at 402–03, 112 S.Ct. at 1391–92, n. 9 (Court noting that, due to the elimination of the 45 day rule from § 547(c)(2), it "may mean that, in the context of a check payment, there is now less need to precisely date and time when a check transfer occurs for purposes of § 547(c)(2)."); See also Norton Bankruptcy Law and Practice 2d, § 57.15, Page 57–81 (June 2004) ("Subsequent to *Barnhill,* the focus on check related issues for Code § 547(c)(2) purposes should not be on the time of transfer but on whether the transaction satisfies the three components of the exception so as to be an ordinary transaction.")

The previously suggested guidelines, which, as noted, this court deems to be consistent with *Tennessee Chemical,* provide that the Debtor's communications and activities and the Creditor's communications and activities, including the late No-

vember/early December payments, even if they never occurred in the parties' prior history, are in the ordinary course of the parties' financial affairs. This is particularly true since the payments were sent and received within the terms of the parties' existing Net 30 payment terms and prior payment history. (Creditor Exhibits TT, TT–1, UU, VV, VV–1, WW, XX, XX–1, YY; Debtor Exhibits 60, 60–A, 152 and 153 [6]; the testimony of the Debtor's expert, Bob Scheufler, the testimony of the Debtor's former Chief Financial Officer, Gearry Davenport, the testimony of the Debtor's former President, Robert Wilson, the testimony of the former Manager of the Creditor's Credit Department, Jefferson Norris, Jr., testimony of the Creditor's former Assistant Credit Manager, Christopher Canipe and the testimony of the Debtor's witness, Donald Kennedy)

### B. The Objective Prong—11 U.S.C. § 547(c)(2)(C)

■ Concerning the objective test of "ordinary business terms," the question is whether the check transfers were ordinary in the industry. The Sixth Circuit has instructed that check transfers should be considered ordinary unless they are so unusual as to be aberrant for the [furniture] industry. See *Carled*, 91 F.3d at 818.

In regard to the change by the Debtor, in response to the Creditor's collection communications, making checks available for mailing 25 days after the date of the Creditor's invoice, the Debtor's expert, Mr. Scheufler, opined that was not ordinary, since the payment average of 36 days, which was the average recited in the November 9, 1999 e-mail, was already ordinary in the industry. Wallace Epperson, the Creditor's expert, who has developed, over a period of 33 years in the furniture

industry, considerable expertise in connection with these issues, opined that all the payments, during the preference period prior to December 1999, were made according to ordinary terms for the furniture industry. In connection with this time period, the court is more persuaded by the testimony of Mr. Epperson. After considering all the testimony of both expert witnesses and the related evidence, the court finds that all the payments during this period were ordinary in accordance with the standards prevailing in the furniture industry.

Accordingly, the court determines the Creditor sustained the required burden of proof required under 11 U.S.C. § 547(c)(2)(A),(B) and (C) in connection with the transfers prior to December 1999 and the Debtor may not avoid these transfers as preferences.

### 4. The preference period during December 1999 and the parties' ordinary course of business.

Not surprisingly, the relationship between the Creditor and the Debtor did not remain static as the preference period continued into December. Although December 1, 1999 is a date of some significance (It is the date of a letter clarifying the parties' new terms for payments going forward would now be "2%/15 days." (Creditor Exhibit C)), the demarcation between November 30th and December 1st is not a chasm that abruptly appears in the parties' financial affairs; but, rather, an avenue that led to a new set of activities, which became enmeshed in all aspects of the parties' financial affairs. A November 29, 1999 confidential Furniture Manufacturers Credit Association report was sent to the Creditor. (Joint Exhibit 8) This report

---

**6.** These summaries were stipulated by the parties to be admitted without objection per Federal Rule of Evidence 1006. *Stipulations by Roberds, Inc. and Broyhill Furniture* (Doc. 236)

discussed the financial problems of the Debtor, particularly the third quarter losses. This report was forwarded to Mr. Norris by Mr. Church, with a note to have Mr. Norris ask Mr. Davenport for monthly business plans and budget results. On December 3, 1999, Mr. Davenport informed the Creditor this information was not public and could not be given to the Creditor. (See p. 5 of the Report)

It is important to recognize that the fact pattern of this adversary proceeding presents a "flip" of the preference decisions which focus on late payments. This adversary proceeding presented a series of preferences which involve accelerated payments. This issue of accelerated payments was noted in the preference period prior to December 1999, during which the Debtor implemented an internal 25 day payment procedure in order to assist the Creditor's receipt of funds within the parties' then Net 30 terms. During this December 1999 period, consistent with the previously reviewed Debtor's restructuring plan, which proposed to make every possible effort to satisfy the Creditor's demands, since receipt of furniture was crucial to maintaining the Debtor's existing business and a constitutive element of any future bankruptcy reorganization plan, the debtor engaged in a more accelerated payment process to assure the overall debt to the Creditor would be reduced to the smallest possible amount at the time the Debtor filed bankruptcy.

During this period, there are substantial differences from the prior period in every significant aspect of the parties' financial affairs. Almost without exception, the changes in this period involve the Creditor

and Debtor "acting," rather than "asking" and, consistent with the previously listed guidelines, involve combined communications and activities which are not ordinary. Unlike in the previous period, the reality of these communications and activities had a continually adverse economic impact on the Debtor and were inconsistent with the requirements of both the subjective and the objective prongs of § 547(c)(2).

### A. The Subjective Prong—11 U.S.C. § 547(c)(2)(B)

██ Among the more significant changes from the prior period to this period are the changes in the terms and credit limits the Creditor imposed upon the Debtor, which effectively limited the Debtor's receipt of goods from the Creditor. During December 1999, although the credit limit nominally remained at $750,000, the availability of credit in connection with every proposed transaction became subject to review and individual determination by the Creditor. As of the January 6, 2000 letter from Mr. Church, any credit relationship between the parties was over. (Joint Exhibit 10; Debtor Exhibits 65 and 66) Subsequently, on January 20, 2000 (the day after the chapter 11 filing), the Debtor's credit limit (based on the Creditor's internal computer records [See Creditor Exhibit R]) was formally reduced to $500,000.[7] The credible testimony of Mr. Davenport established that these credit holds were enforced by the beginning of December 1999. His testimony established that during December 1999, as a result of these credit holds, the Debtor had to "work out what [the Creditor] would release for shipment," meaning the Debtor

---

7. The credit limit reduction appeared to have occurred earlier. (See Creditor Exhibit H—January 3, 2000 e-mail discussing a $500,000 credit limit.) Regardless, the evidence established, by requiring individual negotiations for the shipment of particular merchandise, based on credit holds imposed by the Creditor, all credit transactions during this time were carefully monitored by the Creditor, regardless of the credit limit indicated in the Creditor's internal computer records (Creditor Exhibit R).

had to continue to reduce the Creditor's debt in order to "continue to receive product."

Additionally, the change to 2% Net 15 payment terms occurred following December 1, 1999. A December 1, 1999 letter from Mr. Church to Mr. Davenport confirmed this change in payment terms. (See Creditor Exhibit C) The letter also stated, "Upon receipt of your confirmation we have approximately $250,000 in merchandise to ship." The Court determines the continued availability of credit from the Creditor was crucial to the then current operating structure of the Debtor's business and an integral part of any contemplated bankruptcy reorganization. The Creditor's change in credit terms and enforcement of credit limits, which resulted in the Creditor withholding the shipment of goods until payment satisfactory to the Creditor was arranged, was not ordinary in the parties' business affairs and had a severe adverse economic effect on the Debtor, which preferred this Creditor to the continuing detriment of many of the Debtor's other creditors. Based on the Creditor's internal records, the Debtor reduced its debt to the Creditor from $1,130,554.13 on November 30, 1999 to $492,591.31 as of January 20, 2000 (the day after the chapter 11 filing). (Creditor Exhibit R) One of the ways the Debtor transferred these funds to the Creditor was from deposits customers made with the Debtor. The Debtor's liability for customer deposits increased by approximately $2,500,000 in the period from the end of the third quarter (September 30, 1999) until the Debtor's bankruptcy was filed on January 19, 2000. The amount the Debtor owed for customer deposits on the filing date was scheduled at $13,958,550.98. (Compare Debtor Exhibit 87—Schedule E, p. 7 of 38 and Debtor Exhibit 141, p. 3 of 24; See also Joint Exhibit 12, p. 34 of 66)

The uncontradicted evidence established that, although 2% Net 15 did imply Net 30 terms with a discount of two percent of the invoice amount if the invoice was paid within fifteen days, the Creditor permitted the Debtor to take these discounts, even though the Debtor repeatedly failed to pay invoices within fifteen days. This result is consistent with the Creditor's goal of reducing its overall debt to the Debtor and its willingness to take unprecedented steps in the parties' relationship to achieve that goal. The key issue, as credibly testified to both by Robert Wilson, the Debtor's former President and Melvin Baskin, the Debtor's former Chief Executive Officer, was that the Debtor, in a manner that had never occurred in the parties' history, was being pressured for accelerated payments, through the Creditor's constantly enforced credit limits and the use of credit holds. This form of pressure, with which the Debtor was constantly complying, had never occurred in the parties' history. The paramount concern of the Debtor was to provide the Creditor with any requested payments to ensure merchandise would be sent, particularly for the crucial holiday season. By contrast, the two percent discount was of little importance to the Debtor.[8] (See the testimony of Mr. Wilson and Mr. Baskin)

In order for the Debtor to accelerate payment to the Creditor and to implement

---

8. The Debtor asserted at trial that, particularly relying on an e-mail (Creditor Exhibit H) and certain internal documents of the Creditor (See, e.g., Creditor Exhibit K), the payment terms were changed not to "2% Net 15," but "Net 15" (i.e. payments are due in 15 days). The Creditor argued the e-mail was a "typo" and the internal coding of the Debtor did not have the term "2% Net 15." (See Creditor Exhibit J) Even assuming the Creditor's argument is correct, the court finds that the Creditor failed to prove any of the checks dated on or after December 6, 1999 were in the ordinary course of business.

the change to 2% Net 15, the Creditor began sending invoices via facsimile in early December 1999. (Joint Exhibit 9) The Debtor planned to federal express checks directly to the Creditor in Lenoir, North Carolina, rather than send checks to the Creditor's lockbox by ordinary mail. In another example of the "rhetoric v. reality" of the events in the parties' financial affairs, the evidence established that, whatever the intentions of the parties, none of the checks were ever sent by federal express to the Creditor. (The only exception was the previously discussed check which was voided and replaced with the January 11, 2000 wire transfer.)

The court finds that in this period: (1) the credit limit of $750,000 was vigorously enforced by the Creditor; (2) credit holds, involving individual negotiations resulting in payments satisfactory to the Creditor prior to the shipment of furniture, were in effect; (3) payment terms were changed; (4) the Debtor paid, on average, earlier than Net 30 terms [9]; and (5) other creditors were being significantly delayed, or denied, in the receipt of their payments while this Creditor was receiving accelerated payments and—none of these events had ever occurred in the parties' history.

Considering all the evidence, the court finds that the Creditor failed to sustain, by a preponderance of the evidence, the required burden under subjective prong of 11 U.S.C. § 547(c)(2)(B) for the check dated December 6, 1999 (Debtor Exhibit 26) and all subsequent checks during the preference period.

### B. The Objective Prong—11 U.S.C. § 547(c)(2)(C)

In connection with the objective prong [§ 547(c)(2)(C)] during this period, the court, again, received the testimony of the parties' expert witnesses. The Debtor's expert, Mr. Scheufler, emphasized that the changes in the credit activities between the parties were not ordinary for the furniture industry. Specifically, Mr. Scheufler opined the change from adjusting the Debtor's payment system to provide checks at 25 days in order to assist the Creditor's receipt of these payments Net 30 to a system of payment predicated on 2% Net 15 was not ordinary in the furniture industry, even if the Debtor never made a 15 day payment and the Creditor still permitted the two percent discount. He testified to the significant adverse economic impact any such accelerated payment program had on the Debtor, which was already experiencing continually increasing cash flow problems, a diminishing availability of credit and no overall improvement in sales.

The Creditor's expert, Mr. Epperson testified that, even during this period, including the changes in credit terms, an enforced credit limit, credit holds and individual negotiations to obtain furniture shipments, none of which had ever occurred in the parties' history, were, nevertheless ordinary, in the industry.

In connection with this period, the court finds the testimony of the Debtor's expert, Mr. Scheufler, considerably more persuasive. The court finds the payments by the Debtor to the Creditor during this period were not ordinary in the furniture industry.

Considering all the evidence, the court finds that the Creditor failed to sustain, by a preponderance of the evidence, the required burden under objective prong of 11 U.S.C. § 547(c)(2)(C). As a result, the court finds the transfers during this period

---

9. Mr. Kennedy testified that December payments averaged about 24 days from invoice.

(See also Debtor Exhibit 153)

[beginning with the check dated December 6, 1999], in the amount of $732,700.68 are preferences which are not avoidable by the Creditor. The Debtor may recover this amount from the Creditor, subject to the remaining defense of subsequent new value—11 U.S.C. § 547(c)(4).

## III. THE SUBSEQUENT NEW VALUE ISSUE

**Under 11 U.S.C. § 547(c)(4), can the Creditor assert, as a defense to a preference payment, subsequent new value when: (1) the subsequent new value was given to the Debtor (prior to the filing of the bankruptcy and subsequent to a preference payment); (2) the subsequent new value given to the Debtor was repaid by the Debtor to the Creditor; *and* (3) the Debtor's repayment of the subsequent new value *can* ultimately be avoided (is *not* ultimately found to be "otherwise unavoidable") by the Debtor?**

11 U.S.C. § 547(c)(4) states that:

The trustee may not avoid under this section a transfer—

to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

 (A) not secured by an otherwise unavoidable security interest; and

 (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor [.]

■ The Creditor has asserted the defense of subsequent new value. This affirmative defense is based on the premise that if a creditor receives a preference, but subsequently supplies new value (in this adversary proceeding, furniture) to the debtor, this subsequent new value should be a defense to the preference. The policy is that the creditor, having replenished the debtor's estate so that there has been no overall diminution in the estate, has not, in reality, been preferred by the debtor.

■ The reported decisions establish that this arguably simple policy has proven less than simple in application. The text of 11 U.S.C. § 547(c)(4)(B) contains a double-negative and it has been noted this may have contributed to confusion in interpreting the statutory language. See *Boyd v. The Water Doctor (In re Check Reporting Srvs., Inc.)*, 140 B.R. 425, 434 (Bankr. W.D.Mich.1992). Two distinct methods of determining the appropriate amount of subsequent new value exist in the current case law. Depending on the facts of a particular adversary proceeding, the methodology utilized can produce dramatically different results. The Sixth Circuit Court of Appeals has not addressed, nor has this court ruled on, this question of statutory interpretation.

Before reviewing the two methodologies, it is important to note the binding requirement that this court must apply the plain meaning of the statutory language, unless it is the rare instance in which a "literal application of the statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989). In those rare instances, the intention of the drafters is paramount. *Id.*

The Debtor argued that "paid" new value cannot be allowed as an affirmative defense to a preferential transfer. This argument asserts that if a creditor received a transfer determined to be a preference, then subsequently provides new value, if, after the creditor has provided this subsequent new value, the creditor receives an additional transfer from the debtor, that additional transfer reduces the subsequent new value defense to the ↖

original preference, because, in the nomenclature of this position in the case law, the new value provided by the creditor has been "paid" by the debtor. It, of course, must be recognized the word "paid" is not present in the text of the statute.

The Creditor argued that paid new value may be an affirmative defense to a preference if, in the text of the statute, the debtor, in the repayment of the subsequent new value, did not make "an otherwise unavoidable transfer." Under the line of cases the Creditor advances, the key question (without the confusing double-negative in the statute) is simply: Did the Debtor, in repaying the subsequent new value provided by the Creditor, repay with a transfer that ultimately can be avoided by the Debtor? If that repayment by the Debtor ultimately can be avoided, the Creditor argues the subsequent new value provided should still be allowed as a defense. As will be further explained, the court agrees with the line of cases which adopt this view.

The difference in the parties' positions, reflecting the two opposing lines of authority, can be illustrated by a simple example:

- The debtor pays the creditor $50 on an open account
- Subsequently, the creditor advances the Debtor $20 worth of goods
- Thereafter, the debtor pays the creditor $20 on the open account
- Subsequently, the creditor advances the debtor $30 worth of goods
- The debtor files bankruptcy

Under the Debtor's position, a creditor can provide subsequent new value, but the subsequent new value must remain unpaid and, in the above example, the first $20 advance by the creditor was repaid, so it is not considered subsequent new value. The second advance by the creditor remains unpaid so it is considered subsequent new value. Accordingly, the net preference total is $70 ($50, plus $20, paid by the debtor on the open account), minus $30 in subsequent new value paid to the debtor by the creditor, for a net total preference of $40.

Under the Creditor's position, a creditor can assert subsequent new value as a defense, even if it is paid by the debtor, as long as that payment can be ultimately avoided (typically, recoverable as a preference because it meets the elements of § 547(b) and is not subject to any of the other § 547(c) defenses) by the debtor. Again, in the above example, the $20 advance by the creditor has been repaid; but, if that repayment to the creditor is ultimately avoided by the debtor (again, typically because the repayment is recoverable as a preference because it meets the elements of § 547(b) and is not subject to any of the other § 547(c) defenses), the paid subsequent new value must be counted as subsequent new value. Thus, the $70 ($50, plus $20) in preference payments is offset by $50 in advances by the creditor (the $30 unpaid advance and also the $20 advance, which was paid by the Debtor, but can ultimately be avoided by the debtor) and the net total preference amount subject to recovery is $20, not $40.

The position that "new value must remain unpaid" is followed by the Third, Seventh and Eleventh Circuits. The position that new value which, restated without the double-negative, is "otherwise avoidable" is a proper affirmative defense under the language of 11 U.S.C. § 547(c)(4)(B) is followed by the Fifth, Eighth and Ninth Circuits. See also *Check Reporting Svcs.*, 140 B.R. at 430–44.

In *Mosier v. Ever–Fresh Food Co. (In re IRFM, Inc.)*, 52 F.3d 228 (9th Cir.1995), the court reviewed the two competing analyses of the 11 U.S.C. § 547(c)(4)(B):

Courts and commentators agree that the exception contains two key elements. First, the creditor must give unsecured new value and, second, this new value must be given *after* the preferential transfer. See *In re Fulghum Constr. Corp.*, 706 F.2d 171, 172 (6th Cir.) *cert. denied,* 464 U.S. 935, 104 S.Ct. 342, 343, 78 L.Ed.2d 310 (1983). The majority of courts have also adopted a short hand approach to section 547(c)(4)(B) and hold that section 547(c)(4) contains a third element, that the new value must remain unpaid. The Eighth Circuit recently followed this approach in *In re Kroh Bros. Dev. Co.*, 930 F.2d 648, 653 (8th Cir. 1991) (creditor who has been paid for the new value by the debtor may not assert a new value defense). *See also In re New York City Shoes, Inc.*, 880 F.2d 679, 680 (3d Cir.1989); *In re Jet Florida Sys., Inc.*, 841 F.2d 1082, 1083 (11th Cir.1988); *In the Matter of Prescott,* 805 F.2d 719, 731 (7th Cir.1986). The rationale for this position is (1) if new value has been repaid by the debtor, the estate has not been replenished and; (2) the creditor is permitted the double benefit of a new value defense and the repayment of the new value. See *Kroh Bros.*, 930 F.2d at 652. However, focusing only on the issue of whether the new value is unpaid may lead to some absurd results, as Mosier's position demonstrates. As a result, an emerging trend has developed where a few courts have reached the contrary result and hold that new value need not remain unpaid. See *In re Ladera Heights Comm. Hosp., Inc.*, 152 B.R. 964, 968 (Bankr.C.D.Cal.1993).

However, an even more recent trend has developed where courts and commentators have rejected the short hand approach and have undertaken a more thorough analysis of the language of section 547(c)(4)(B). These cases reason that the numerous decisions focusing on the narrow issue of whether the new value remains unpaid are incomplete and inaccurate. *In the Matter of Toyota of Jefferson, Inc.*, 14 F.3d 1088, 1093 n. 2 (5th Cir.1994); *In re PNP Holdings Corp.*, 167 B.R. 619, 629 (Bankr. W.D.Wash.1994); *In re Check Reporting Servs., Inc.*, 140 B.R. 425, 431–34 (Bankr.W.D.Mich.1992).

According to this view, the proper inquiry directed by section 547(c)(4)(B) is whether the new value has been paid for by "an otherwise unavoidable transfer." *In the Matter of Toyota of Jefferson,* 14 F.3d at 1093 n. 2. This inquiry follows the *Kroh Bros.* rationale that a creditor should not get double credit for an advance of new value. However, instead of barring the new value defense altogether anytime new value has been repaid, this approach allows the new value defense if the trustee can recover the repayment by some other means.

This analysis fully comports with the statute's plain language. While the phrase "the debtor did not make an otherwise unavoidable transfer" is complicated, it is not ambiguous and its meaning is easily discernible. *See Check Reporting Servs.,* 140 B.R. at 434–36 (conducting an exhaustive analysis of the phrase "did not make an otherwise unavoidable transfer"). As one commentator has explained:

> If the debtor has made payments for goods or services that the creditor supplied on unsecured credit after an earlier preference, and if these subsequent payments are themselves voidable as preferences (or on any other ground), then under section 547(c)(4)(B) the creditor should be able to invoke those unsecured credit extensions as a defense to the recovery of the earlier voidable preference.

On the other hand, the debtor's subsequent payments might not be voidable on any other ground and not voidable under section 547, because the goods and services were given C.O.D. rather than on a credit, or because the creditor has a defense under section 547(c)(1), (2), or (3). In this situation, the creditor may keep his payments but has no section 547(c)(4) defense to the trustee's action to recover the earlier preference. In either event, the creditor gets credit only once for goods and services later supplied.

Vern Countryman, *The Concept of a Voidable Preference in Bankruptcy*, 38 Vand.L.Rev. 713, 788 (1985) (emphasis added and footnotes omitted) (quoted in *In the Matter of Toyota of Jefferson, Inc.*, 14 F.3d at 1092–93).

We agree with this analysis and hold that a new value defense is permitted unless the debtor repays the new value by a transfer which is otherwise unavoidable.

*Id.* at 231–32. Similarly, the Eighth Circuit has stated:

Section 547(c)(4)(B) defines subsequent new value as value not offset by "an *otherwise unavoidable transfer*" to the creditor. Here, [the creditor] received weekly payments made after employees provided subsequent new value, but those payments were "otherwise *avoidable* " and therefore cannot deprive [the creditor] of § 547(c)(4) protection." (emphasis in original)

*Jones Truck Lines, Inc v. Central States (In re Jones Truck Lines, Inc.)*, 130 F.3d 323, 329 (8th Cir.1997)

The Fifth Circuit adopted this text based approach and noted that the axiom "subsequent new value must remain unpaid," restated in earlier circuit decisions, does not accurately describe the plain meaning of the statute:

Some of our sister circuits have, in dicta, described § 547(c)(4)(B) as requiring the subsequent advance to go "unpaid." See *In re Kroh Brothers*, 930 F.2d at 652; *New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York City Shoes, Inc.)*, 880 F.2d 679, 680 (3d Cir. 1989); *Charisma Inv. Co., N.V. v. Airport Sys., Inc. (In re Jet Florida Sys., Inc.)*, 841 F.2d 1082, 1083 (11th Cir. 1988); *In re Prescott*, 805 F.2d 719, 731 (7th Cir.1986). Although this description may be an adequate shorthand description of § 547(c)(4)(B), a more complete statement of the (c)(4) exception would be that a creditor who raises it has the burden of proving that (1) new value was extended after the preferential payment sought to be avoided, (2) the new value is not secured with an otherwise unavoidable security interest, and (3) the new value has not been repaid with an otherwise unavoidable transfer. *Cf. In re Prescott*, 805 F.2d at 731 ("The creditor that raises a 'subsequent advance' defense has the burden of establishing that new value was extended, which remains unsecured and unpaid after the preferential transfer.").

*Laker v. Vallette (In re Toyota of Jefferson, Inc.)*, 14 F.3d 1088, 1093, fn. 2 (5th Cir.1994); Accord Norton Bankruptcy Law and Practice 2d, § 57.20, Page 57–112–14 (June 2004) ("There is a split of authority whether [the 547(c)(4) ] exception requires that new value remain unpaid . . . . The resolution of this conflict is found in the Code itself. . . . The focus of the inquiry is on the avoidability of the debtor's subsequent payments, and not on whether the new value remains unpaid."; (footnotes omitted)); See also Deborah Thorne and Jesus E. Batista, *Are All Creditor "Animals" Equal: Treatment of New Value Under § 547*, 23–APR Am. Bankr.Inst. J. 22 (April 2004); Robert H.

Bowmar, *The New Value Exception To The Trustee's Preference Avoidance Power: Getting The Computation Straight*, 69 Am. Bankr.L.J. 65 (Winter 1995); Harris Quinn, *The Subsequent New Value Exception Under Section 547(c)(4) of the Bankruptcy Code—Judicial Gloss is Creditors' Loss*, 22 Mem. State L.Rev. 667 (Summer 1994) (All three articles concluding that the "new value must remain unpaid" axiom does not comport with the plain meaning of § 547(c)(4)).

In reviewing the circuit decisions relied on by the Debtor, this court notes these decisions state the axiom "new value must remain unpaid" as a shorthand, in dicta, or, to the extent these decisions represent the holdings of particular circuits, without an application of the plain meaning of the statutory language. See *New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York Shoes, Inc.)*, 880 F.2d 679 (3rd Cir.1989); *Charisma Inv. Co. v. Airport Sys., Inc. (In re Jet Florida Sys., Inc.)*, 841 F.2d 1082 (11th Cir.1988) (new value must remain unpaid); *In re Prescott*, 805 F.2d 719 (7th Cir.1986) (new value must remain unpaid). Without exhaustively reviewing all the lower court cases discussing this issue, the court determines that very few recent lower court decisions, which are clearly not bound by a particular circuit's ruling, have followed the "new value must remain unpaid" axiom. See, e.g., *Claybrook v. SOL Bldg. Materials Corp. (In re U.S. Wood Products, Inc.)*, 2004 WL 870830, *3 (Bankr.D.Del. Apr.22, 2004) (Bankruptcy court followed the *New York Shoes* decision.)

The court adopts the legal interpretation of 11 U.S.C. § 547(c)(4)(B) that "paid" subsequent new value may be an affirmative defense to a preferential transfer if the subsequent new value is, stated without the double-negative, "otherwise avoidable" by the debtor. The court finds this approach follows the plain meaning of the statutory language and also meets the policy objective of Congress when the affirmative defense was enacted. See *Chrysler Credit Corp. v. Hall*, 312 B.R. 797, 805 (E.D.Va.2004) (Court finding the "otherwise avoidable" approach is supported by the plain meaning of the statutory language and the policy of § 547(c)(4).)

■ The court notes that any valid subsequent new value payment [as long as it is pre-petition—See *TennOhio Transp. Co. v. Felco Comm. Servs. (In re TennOhio Transp. Co.)*, 255 B.R. 307, 310 (Bankr.S.D.Ohio 2000)] can reduce any prior preference payment; it need not be the immediate prior preference. It has been persuasively rejected that new value can only offset the immediately preceding preference. This analysis, usually referred to as the *Leathers* approach [See *Leathers v. Prime Leather Finishes Co.*, 40 B.R. 248 (D.Me.1984)], has been rejected in favor of a better reasoned approach, which allows new value to be carried over to any prior preference, rather than only the immediately preceding one. See *Thomas W. Garland, Inc. v. Union Elec. Co. (In re Thomas W. Garland, Inc.)*, 19 B.R. 920 (Bankr.E.D.Mo.1982). The *Leathers* approach appears to have almost no viability left in the case law. See *Slone–Stiver v. Clemens Oil (In re Tower Metal Alloy Co.)*, 193 B.R. 273, 275–76 (Bankr.S.D.Ohio 1996).

It is important to recognize, under the analysis this court adopts, a creditor cannot receive a windfall or double benefit. If subsequent new value given by a creditor is paid with a subsequent advance from the debtor and this payment is subject to another affirmative defense (such as ordinary course of business, for example) which would make the payment "otherwise unavoidable," then the paid new value given

cannot be used as an affirmative defense to any prior preferential transfer.

The Debtor argued that counting paid new value is unfair to debtors because it allows new value to be counted where the new value provided is no longer an unpaid receivable on its books. See *Iannacone v. Klement Sausage Co., Inc. (In re Hancock–Nelson Mercantile Co., Inc.)*, 122 B.R. 1006, 1016–17 (Bankr.D.Minn.1991). This argument ignores the plain meaning of the statutory language. Even if such a policy argument could be considered, it views new value analysis as a static formula that can be determined without regard to whether the paid new value will ultimately be returned to the debtor. See *Official Cmte. of Unsecured Creditors v. American Sterilizer (In re Comptronix Corp.)*, 239 B.R. 357, 363 (Bankr. M.D.Tenn.1999). The statutory language

does not allow the new value exception without consideration of the viability of other defenses to preferential transfers. It is also true, as the Debtor notes, this approach is somewhat more complex because it requires the court to analyze other available defenses to paid new value first; however, this policy argument, valid or not, is not an acceptable reason to avoid applying the plain meaning of the statutory language.

In this instance, the court has determined that the checks dated from December 6, 1999 until December 29, 1999 are otherwise unavoidable—that is, these payments are not subject to any other affirmative defenses. Therefore, considering the remaining transfers as preferential, but subject to the subsequent new value defense, the following chart represents the net preference: [10]

---

**10.** All the data provided, except the court's own calculation of the final net preference amount, was stipulated to by the parties. (Doc. 216) To the extent a check from the Debtor was received at the lockbox on the same day as the invoice/shipping date of furniture from the Creditor, the court finds the furniture does not constitute subsequent new value to that preference.

| Invoice/Ship Date | Subsequent Net Value Amount | Check Number | Check Date | Check Amount | Payment Received at the Lockbox | Net Preference |
|---|---|---|---|---|---|---|
| | | 118797 | 12/6/99 | $42,406.12 | 12/9/99 | $42,406.12 |
| 12/10/99 | $76,845.00 | | | | | 0 |
| 12/11/99 | $9,825.00 | | | | | 0 |
| 12/13/99 | $13,513.00 | | | | | 0 |
| | | 118966 | 12/8/99 | $110,242.86 | 12/13/99 | $110,242.86 |
| 12/14/99 | $19,165.00 | | | | | $91,077.86 |
| 12/15/99 | $3,665.00 | | | | | $87,412.86 |
| 12/16/99 | $765.00 | | | | | $86,647.86 |
| | | 119194 | 12/10/99 | $2,594.34 | 12/16/99 | $89,242.20 |
| | | 119337 | 12/13/99 | $186,046.38 | 12/16/99 | $275,288.58 |
| 12/18/99 | $990.00 | | | | | $274,298.58 |
| | | 119482 | 12/15/99 | $35,380.51 | 12/20/99 | $309,679.09 |
| 12/21/99 | $122.00 | | | | | $309,557.09 |
| | | 119557 | 12/17/99 | $104,439.05 | 12/21/99 | $413,996.14 |
| | | 119751 | 12/20/99 | $98,601.91 | 12/23/99 | $512,598.05 |
| 12/27/99 | $520.00 | | | | | $512,078.05 |
| | | 119934 | 12/23/99 | $10,743.12 | 12/27/99 | $522,821.17 |
| 12/29/99 | $30,104.00 | | | | | $492,717.17 |
| 12/30/99 | $30,536.00 | | | | | $462,181.17 |
| 12/31/99 | $126,149.00 | | | | | $336,032.17 |
| 1/1/00 | $68,132.00 | | | | | $267,900.17 |
| | | 120202 | 12/27/99 | $71,360.05 | 1/1/00 | $339,260.22 |
| 1/3/00 | $33,975.00 | | | | | $305,285.22 |
| | | 120410 | 12/29/99 | $70,886.34 | 1/3/00 | $376,171.56 |
| 1/4/00 | $1,300.00 | | | | | $374,871.56 |
| 1/5/00 | $165.00 | | | | | $374,706.56 |
| 1/10/00 | $255.00 | | | | | $374,451.56 |
| 1/12/00 | $1,920.00 | | | | | **$372,531.56** |

Accordingly, the total amount of preferential transfers which may be recovered [11], net of the affirmative § 547(c) defenses, is $372,531.56.

## IV. THE COMPULSORY COUNTERCLAIM ISSUE

**Is the Creditor's assertion of an administrative claim a compulsory counterclaim to the Debtor's complaint?**

The Debtor has alleged that any administrative claim of the Creditor is precluded by the Creditor's failure to file a compulsory counterclaim in its answer to the Debtor's complaint. (Doc. 1) The court disagrees.

11. The court finds the stipulations of the parties (Doc. 141) and the evidence presented at

Bankruptcy Rule 7013 states, in pertinent part, that:

Rule 13 F.R.Civ.P. applies in adversary proceedings, except that a party sued by a trustee need not state as a counterclaim that the party has against the debtor, the debtor's property, or the estate, unless the claim arose after the entry of an order for relief. . . .

Federal Rule of Civil Procedure 13(a) and (b) states that:

*A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's*

trial meets the Debtor's burden for Count III (11 U.S.C. § 550) of the complaint. (Doc. 1)

*claim* and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction. But the pleader need not state the claim if (1) at the time the action was commenced the claim was the subject of another pending action, or (2) the opposing party brought suit upon the claim by attachment or other process by which the court did not acquire jurisdiction to render a personal judgment on that claim, and the pleader is not stating any counterclaim under this Rule 13.

*A pleading may state as a counterclaim any claim against an opposing party not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim.* (emphasis added).

 Bankruptcy Rule 7013 applies Federal Rule of Civil Procedure 13 to the Creditor's administrative claim because "the claim arose after the entry of an order for relief." The question presented is whether the Creditor's asserted administrative claim of $183,281.68 [Claim # 3684] was a permissive or compulsory counterclaim to the Debtor's complaint. In order to determine whether a counterclaim is compulsory, the Sixth Circuit applies a "logical relationship" test. This analysis examines "whether the issues of law and fact raised by the claims are largely the same and whether substantially the same evidence would support or refute both claims." *Sanders v. First Nat'l Bank & Trust Co.,* 936 F.2d 273, 277 (6th Cir. 1991). This court considers the following factors:

- Is there a logical relationship between the two claims?
- Are the issues of fact and law raised by the claim and counterclaim largely the same?

- Would res judicata bar a subsequent suit on the counterclaim if the court were not to take jurisdiction?
- Would substantially the same evidence support or refute both the claim and the counterclaim?

See *Brown v. United States (In re Rebel Coal Co.),* 944 F.2d 320, 322 (6th Cir.1991), *quoting Maddox v. Kentucky Fin. Co., Inc.,* 736 F.2d 380, 382 (6th Cir.1984).

 The complaint and subsequent trial addressed pre-petition transfers between the parties and the legal effect of those transfers. These issues are different, both factually and legally, than those considered in the allowance of an administrative claim. For example, considerable time and attention was devoted to evidence exclusively concerned with the pre-petition relationship between the parties. Such evidence would be of little, or no, relevance to a post petition administrative claim. The court would begin a determination of the allowed amount of the alleged post-petition administrative claim [See 11 U.S.C. § 503(b)(1)] by examining whether it benefited the Debtor's estate. See generally *PBGC v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.),* 126 F.3d 811 (6th Cir.1997). Again, this type of evidence was not required, and arguably, not even relevant, in the trial of the Debtor's complaint.

The factors required to determine that the Creditor's asserted administrative claim is a compulsory counterclaim to the Debtor's preference complaint are not present. The Creditor was not required to file a compulsory counterclaim or be barred from subsequently obtaining an allowed administrative claim. Rather, the Creditor is entitled to have any asserted administrative claim determined at a later date.

## V. 11 U.S.C. § 502(d) ISSUES

**May the Creditor obtain an allowed administrative claim prior to satisfaction of any preference recovery judgment against the Creditor?**

■ 11 U.S.C. § 502(d) states that:

Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

Under § 502(d), any pre-petition claim of the Creditor is disallowed until the Creditor has satisfied the preference recovery judgment. The Debtor argued further that, pursuant to 11 U.S.C. § 502(d), no administrative claim of the Creditor can be allowed, without regard to any payment issues, until any preference recovery judgment has been satisfied.

There is a split in the case law on whether an administrative claim is subject to the requirements of 11 U.S.C. § 502(d). See Norton Bankruptcy Law and Practice 2d, § 41.27, Page 131 of the Supplement (June 2004); *Tidwell v. Atlanta Gas Light Co. (In re Georgia Steel, Inc.),* 38 B.R. 829 (Bankr.M.D.Ga.1984) (Administrative claims are subject to § 502(d).): *Microage, Inc. v. Viewsonic Corp. (In re Microage, Inc.),* 291 B.R. 503 (9th Cir. BAP 2002) (Section 502(d) applies to administrative claims, but cannot be used to defeat a previously allowed administrative claim.); *In re Durango Georgia Paper Co.,* 297 B.R. 326, 331 (Bankr.S.D.Ga.2003) ("Section 502(d) does not apply to administrative claims allowable under § 503."); *In re Lids Corp.,* 260 B.R. 680 (Bankr.D.Del. 2001) (Administrative claims are not subject to § 502(d).); *Camelot Music, Inc. v. MHW Adver. and Pub. Relations, Inc. (In re CM Holdings, Inc.),* 264 B.R. 141 (Bankr.D.Del.2000) (Administrative claims not subject to § 502(d).)

This court does not find 11 U.S.C. § 502(d) a barrier to the allowance of an administrative claim; however, the court notes, specifically in the context of this currently administratively insolvent chapter 11 case, payment of this Creditor's administrative claim, whether the allowed amount of the administrative claim is agreed to by the parties, or determined by the court in a separate proceeding, will not be paid until approved by separate order of the court.

### *Conclusion*

Debtor is granted in part, denied in part, judgment on Counts I, III, and IV. Debtor is granted judgment in the amount of $372,531.56 together with interest pursuant to 28 U.S.C. § 1961 from September 1, 2000[12] to the date of this judgment, together with the cost of this proceeding; and thereafter, the judgment shall bear interest pursuant to 28 U.S.C. § 1961 until paid in full.

An order in accordance with this decision will be simultaneously entered.

---

12. See Debtor Exhibit 1—August 18, 2000 demand letter from former counsel for the Debtor to the Creditor and *Rieser v. The Randolph Cty. Bank (In re Masters),* 137 B.R. 254, 262 (Bankr.S.D.Ohio 1992) (allowing prejudgment interest from the earliest date of demand). The parties stipulated the letter was received by the Creditor not later than September 1, 2000.